# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION

| | | |
|---|---|---|
| JONATHAN HOOVER, | § | |
| | § | |
| Plaintiff, | § | No.: 3:19-CV-250 |
| | § | *Jury Trial Demanded* |
| vs. | § | |
| | § | |
| NORFOLK SOUTHERN RAILWAY | § | |
| COMPANY, | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff, Jonathan Hoover, ("Mr. Hoover") sued his current employer, Norfolk Southern Railway Company ("NS") on July 7, 2019. (Complaint, Doc. 1). He sues under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51, *et seq*., for alleged cumulative injury to his knees ("Cumulative Claim") and alleged "reinjury" to his left knee when stepping down from a boxcar ("Dismount Claim"). (*Id.*)

Mr. Hoover's case must be dismissed on three grounds:

1) **Statute of Limitations** - FELA's three year statute of limitations, as a matter of law, bars Mr. Hoover's case entirely because in at least 2015 (if not earlier) Mr. Hoover complained to medical doctors, and sought treatment for, pain in both knees that he knew was aggravated by his work activities.

2) **Federal Preclusion** - Regardless of the statute of limitations, Plaintiff's Dismount Claim is precluded (preempted) and barred by the Federal Railroad Safety Act ("FRSA") and the federal Safety Appliance Act ("SAA"). As a matter of law, the railroad is not liable for complying with Federal Railroad Administration ("FRA") regulations, and the sill step of the subject tank

railcar and the smooth gravel ballast dismount surface complied with FRA regulations. Accordingly, NS (and Plaintiff) are not negligent, and the Dismount Claim should be dismissed. NS's compliance would also preclude Plaintiff's Cumulative Claims as they relate to mounting and dismounting railcars and walking on ballast as Plaintiff has no evidence of non-compliance with railroad regulations.

3) **NS and Plaintiff Are Not Negligent** - Notwithstanding the statute of limitations and federal preclusion, Plaintiff's Dismount Claim and his Cumulative Claims must be dismissed because there is no evidence, and can be no evidence, that these ordinary tasks of carmen, climbing, walking, squatting, etc. that Plaintiff admits cannot be done in any other manner and which he was trained to do as safely as possible, are unreasonable, so NS has not breached its duty to provide a reasonably safe workplace for Plaintiff. Additionally, as it relates to his Dismount Claim, since conditions were compliant – appropriate sill step height and smooth gravel dismount surface - Plaintiff admits that his injury can simply happen through no negligence of anyone.

The material facts are undisputed and there is no genuine issue for trial; accordingly, as a matter of law, NS is entitled to summary judgment, dismissing Plaintiff's Complaint.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Career Car Mechanic – Proud to Work for the Railroad

Mr. Hoover has worked for the railroad since May 18, 1992, approximately 26 years. (Exhibit 1: Hoover Dep. 13:24-14:4, 15:6-11). He is now 56 years old, (*Id.* 14:2), and he continues to work for NS. (see, depo. generally). (He would like to retire at age 60-62, when he will have full railroad retirement benefits, based on his age and years of service. (*Id.* 14:5-15:5).) Mr. Hoover has enjoyed his work for the railroad (*Id.* 16:23); the railroad "provided well for" him (*Id.* 17:9-12); and he is proud to work for NS. (*Id.* 18:5-8). NS is pleased to have Mr. Hoover as an

employee, with an exceptional safety record. (See collective Exhibit 2: Career Service Record (redacted to remove personal identifier information and irrelevant discipline) and Employee History Inquiry).

**Chronology of Mr. Hoover's Work – Carman (Railcar Mechanic & Safety Inspector)**

Mr. Hoover began his work as a car mechanic for the railroad with training in McDonough, Georgia. (Hoover Dep., 22:15-25). He trained as a student carman for three years. (*Id.* 23:1-3). As a junior mechanic for the railroad, he spent most of his time in the Coster Shop in Knoxville, repairing railcars. (*Id.* 22:3-14). During a railroad furlough, he welded for three years. (*Id.* 24:5-22).

From 1998 until much of the yard closed in May 2016, Mr. Hoover worked in NS's John Sevier Yard in Knoxville. (*Id.* 25:25-26:13). Carmen at John Sevier Yard, including Mr. Hoover, perform inbound and outbound safety inspections of a cut of railcars, repair cars in a repair-in-place track facility ("RIP Track"), or drive a pick-up truck out to a yard track, siding, or mainline track to repair cars, called "in-the-line-of-road" repairs. (*Id.* 30:4-10, 65:16-66:23).

After John Sevier Yard substantially reduced operations in April 2016, Mr. Hoover furloughed again from January 2017 to April 2017, working 10 hour days as a carman and welder for a short-line railroad in Oak Ridge. (*Id.* 26:14:17, 25:4-28:24). He then returned to John Sevier Yard. (*Id.* 28:25-30:3). He marked off work on December 1, 2017 for bilateral knee arthroscopic surgery. (*Id.* 238:19-239:8). He returned to work on April 1, 2018, and injured his left knee on April 4, 2018. (Discussed further below in Dismount Claim).

Having returned to work on February 4, 2019 after his April 4, 2018 incident, Mr. Hoover currently works the first shift as a carman (mechanic) leader. (*Id.* 11:8-12:12). Since returning to

work, he has worked on a continuous and satisfactory basis without criticism from his supervisors. (*Id.* 20:16-21:1).

Mr. Hoover's claims relate solely to his "Yard Job" - walking (on ballast) and mounting cars to inspect them in the yard, making minor repairs in the yard, and changing brake shoes - and the abbreviated time he spent "in-the-line-of-road" jacking cars in a yard pocket track (as opposed to the RIP Track, discussed in the next section). (*Id.* 174:6-175:25).

## Carman Hoover's "Yard Job" - Rail Car Safety Inspection & Minor Car Maintenance

Mr. Hoover's "yard job" consisted of either an inbound train car inspection or an outbound train inspection, including buckling air hoses, changing brake shoes, and checking for damage when cars are sorted at the hump. (*Id.* 55:20-56:6). The following photographs (included in collective Exhibit 3) accurately depict[1] the John Sevier Yard, according to Mr. Hoover, where he daily inspected the railcars of inbound and outbound trains, (Hoover Dep. 177:17-25; 179:13-21; 180:18-182:7; 193:7-198:16,; 272:22-273:9):

 

In the 12-track receiving yard (see left photograph above), the carmen would drive in a truck to the track, drive to each end of the train to blue flag (mark) it for inspection, and each work

---

[1] He qualifies that some of the gravel in areas "may be" worse, and some better, than as depicted in the photographs. (Hoover Dep. 272:22-273:9).

towards one another bleeding the air off the cars, inspecting and changing out brake shoes, which are visible without getting underneath the railcar, and inspecting each car of each side of the train. (Hoover Dep. 72:2-24, 179:22-180:13, 180:16-182:7, 183:25-185:2; collective Exhibit 3: Photograph marked "Exhibit 37"). This was a four-man job (reduced to a three-man job in 2008) to walk the train and look for defects on a train that could be up to 120 cars. (Hoover Dep. 178:16-179:12, 182:8-183:4). Railcars are between 50 and 100 feet in length. (*Id.* 185:9-16). On average, in daylight, it takes about two minutes to visually inspect a railcar. (*Id.* 219:23-221:15).

As a carman, Mr. Hoover is familiar with FRA regulations. (*Id.* 68:6-14). He would recognize a defect, for example a car handle or sill step, and if repairable, Mr. Hoover repairs it on site or will "bad order" tag the car to send it to a repair facility, such as the RIP Track. (*Id.* 68:15-70:14). Transportation department switchmen (not carmen) will cut the bad-ordered car from the train so the train can proceed. (*Id.* 70: 15-20).

During an inspection, each carman crosses-over (mounts/dismounts) his cut of cars up to 12 to 15 times to bad order flag a car or replace brake shoes. (*Id.* 187:3-188:1). On average, one out of ten railcars on a train would need a brake shoe change. (*Id.* 188:7-21). A carman chooses whether to kneel with required knee pads or to sit to replace brake shoes, and Mr. Hoover usually knelt. (*Id.* 199:14-201:24). Mr. Hoover estimates it would take four to five minutes to change out a brake shoe, including the time to cut the air out of the car, and he uses a prybar/lever. (Hoover, Dep. 188:22-189:7; see Dep. 189:12-191:24).

Mr. Hoover radios the tower personnel of his inspection in the receiving yard, and trainmen transport the cars to the hump in the classification yard (before 2016). (*Id.* 193:7-194:18). After classification of the cars, the train crew takes the cars to the forwarding yard for the carmen to re-

inspect and air. (*Id.* 195:19-197:19). There is less brake shoe replacement and less cross-over of cars in the forwarding yard. (*Id.* 197:20-198:16).

As related to his walking on ballast, the ballast is not large rocks but walking gravel. (*Id.* 217:11-16). Some areas at the perimeter of the yard were worse, but Mr. Hoover agrees that there is nothing that can done about that because of the terrain slope. (*Id.* 215:21-216:24; see also photo below of subject box car as viewed from the sloped side of Track 12). His only critique about the rest of the small, walking gravel was that occasionally too much or too little gravel was laid out in some places to achieve a perfectly level surface. (Hoover Dep. 216:25-217:10).

Mr. Hoover admits that there is no other way to do the carman's job of changing brake shoes, mounting/dismounting railcars, and walking on surface ballast and across tracks to inspect cars – it is just a common and ordinary part of a carman job. (Hoover Dep. 201:25-203:18, 208:5-209:7; <u>Exhibit 5</u>: Carman Job Tasks).

**<u>Carman Hoover's Rail Car Repair Work</u>**

Mr. Hoover's under-carriage car repair work (changing air brake valves, welding brackets, etc.) was mostly performed in the RIP Track building, similar to an auto-mechanic shop, where in-ground hydraulic jacks are located. (Hoover Dep. 212:14-214:16, see photograph below). This was the large part of Mr. Hoover's career. (*Id.* 173:10-16 (estimating he worked at least 8 years, including present in the RIP Track building)). In this instant action, he voices no complaint about the RIP Track. (See, generally Hoover Dep., see, specifically, *Id.* 174:6-175:25).

For most of his career, rail cars were brought to Mr. Hoover at the RIP Track for repair (as opposed to going out in the yard pocket track or to the mainline for "in-the-line-of-road" repairs). (*Id.* 171:20-172:1). Here are two photographs[2] (included in collective Exhibit 3) of the RIP Track

---

[2] These photographs were part of the Affidavit of Mr. Hoover's supervisor, Mike Chambers, submitted in *Cottle v. Norfolk Southern Ry Co.*, No. 3:18-cv-00344-HBG, Doc. 56-3, which also contains photographs demonstrating in-

(wheel truck is removed from railcar, with railcar raised and supported by the fixed in-ground hydraulic jacks) compared with "in-the-line-of-road" jacking, using a truck boom to manually support and position transportable hydraulic jacks:





For fourteen months, beginning May 2016, while the RIP Track was temporarily closed,[3] Mr. Hoover repaired and occasionally "in-the-line-of-road" jacked railcars at a "pocket" track. (Hoover Dep. 175:8-177:12). Mr. Hoover does not believe that he ever "in-the-line-of-road" jacked a railcar before 2016. (*Id.* 241:15-242:2).[4] In-the-line-of-road repairs/jacking, such as on the mainline or in yard tracks, is a routine job of carmen. *See, Cottle* case, for example. Mr. Hoover simply never had bid on the job before 2016, preferring the RIP Track and Yard Job. (*Id.* 65:16-66:6, 241:15-242:2). Because the yard pocket track 13 did not have permanent in-ground

---

[3] the-line-of-road jacking. Mr. Hoover's fellow carman claimed that an in-the-line-of-road jacked car dropped, injuring him. These allegations were not true, but Magistrate Guyton dismissed the case on other grounds on summary judgment. *See*, 2019 U.S. Dist. LEXIS 180328, 2019 WL 5295184 (E.D. Tenn. Oct. 18, 2019). (All counsel for all parties are the same in *Cottle* and the instant action).

[3] The RIP Track shop was closed in May 2016 because operations had ceased "immensely" at John Sevier Yard, and in 2018, it reopened at the carmen and Mr. Chamber's request. (Chambers Depo. 9:7-12:19).

[4] Although "in-the-line-of-road" jacking was new to Mr. Hoover in 2016, NS provided training. Before May 2016, Mr. Hoover reviewed a training video on jacking cars in the line of road (not shop), (Hoover Dep. 242:11-24; Exh. 2: Employee History Inquiry), he paid attention to the video (*id*. 243:2-3). He was always careful when jacking (*id*. 244:6-10). Soon after May 2016, after carman Cottle's alleged incident, *supra* n.1, Mr. Hoover's training on in-the-line-of road car-jacking increased (Hoover Dep. 245:25-226:9, 247:23-249:5). He carried with him and studied Norfolk Southern's CDI 12-28D Jacking Rail Equipment. (Hoover Dep. 248:5-19).

jacks, like the RIP Track, Mr. Hoover complains about this work because he says it required some heavy lifting (which is denied) with a partner and a boom truck to prepare the base for (blocking) and to position hydraulic jacks (see photograph to right above).  In September 2016, NS had improved the pocket track, placing bridge ties under the rail for a better jacking base surface (i.e. a jack pad).  (Chambers Dep. 10:13-23).  NS denies that the approximate 16 to 20 pocket jackings Plaintiff did with a partner over the course of 14 months, (Hoover Dep. 240:15-21), aggravated his already manifested knee conditions, but as discussed later these claims are time-barred.  During these 14 months until December 2017, Mr. Hoover was still inspecting railcars on inbound and outbound trains and performing railcar repairs in the pocket track that did not require jacking.  (*Id.* 238:19-240:3).

The RIP Track re-opened before Mr. Hoover returned to work in 2018.  (*Id.* 234:14-21). When the RIP Track re-opened, car repairs and jacking were discontinued in the yard pocket track. (*Id.* 235:5-12).

## Reduced Operations After 2016 Means Significantly Less Work for Carmen

Since the 2016 closures at John Sevier Yard, the carmen are not as busy.  (*Id.* 30:11-15). There were less trains to inspect after John Sevier Yard idled in 2016.  (*Id.* 59:8-22).  Accordingly, there have been less cars to inspect.  (*Id.* 219:3-6).  Although less carmen worked a train after 2016, there was also less walking.  (*Id.* 65:5-15).  After the John Sevier Yard reduced operations in 2016, Mr. Hoover repaired 0 to 4 cars per day in the RIP Track.  (*Id.* 28:25-30:3).  On many days at the railroad now, Mr. Hoover spends most of his day in the office handling paperwork.  (*Id.* 21:6-21).

**Railroad Safety and Training**

Norfolk Southern focuses on safety. (Hoover Dep. 35:12-19; <u>Exhibit 11</u>: Return to Work Letter Safety Contact and Training). Norfolk Southern extensively trained Mr. Hoover in safety. (Hoover Dep. 30:16-31:6; Exh. 2: Employee History Inquiry). Norfolk Southern provided and tested Mr. Hoover on safety rules, which he was expected to follow, conducted weekly and quarterly safety meetings with Mr. Hoover and all employees, taught safety presentations, and had supervisors observe work, demonstrate proper techniques, and reminded employees, including Mr. Hoover, of safety rules and practices – called safety contacts. (Hoover Dep. 31:25-32:11, 33:2-8, 36:17-37:6, 37:7-22, 57:14-59:2 and Exh. 2: Employee History Inquiry). Each time he returned from furlough, Mr. Hoover met with his supervisor and caught up on his training. (Hoover Dep. 58:12-59:2).

In addition to special welding safety equipment, Norfolk Southern has always required personal protective equipment – safety glasses, hardhats, knee pads, reflective vests, gloves, hearing protection, and boots with a heel for mounting and dismounting equipment. (Hoover Dep. 39:14-42:21, and <u>Exhibit 7</u>: Injury Report, p. 2 (noting that at the time of his April 2018 dismount incident, Mr. Hoover was wearing his hard hat, prescription safety glasses, leather gloves, reflective vest, and "proper work boots"). Norfolk Southern also encourages employees to invent new safety equipment and practices, which Mr. Hoover himself did. (Hoover Dep. 42:22-44:2; Exh. 2: Career Service Record).

Mr. Hoover regards the safety rules as important and believes they make him more aware of potentially dangerous situations. (Hoover Dep. 32:12-33:1). He recognizes that railroad work is potentially dangerous, so he must work carefully and with awareness of his surroundings. (*Id.* 31:10-24). Carmen work efficiently, self-paced, and deliberately because they are "fixing stuff

that's riding the rails, and it could put people's lives in danger" if they do not work with care.  (*Id.* 38:17-25, 39:7-13).  Mr. Hoover agrees that he has a huge responsibility to repair cars in a proper way, so cars are inspected and repaired to "meet[] AAR and FRA standards." (*Id.* 39: 1-6).

Accordingly, each work day starts with a safety meeting, and a safety job briefing is performed before starting any task, when someone comes into the work area, or when conditions change.  (*Id.* 34:9-35:10).    Norfolk Southern and its employees, including Mr. Hoover, depend on one another and collaborate to work safely.  (*Id.* 37:23-38:5, 45:13-46:20).  He testified:  "Q.· · ·And who is the person most responsible for your own safety in your own mind? A.· · ·For my personal safety?· That would be me ensuring whatever I'm getting ready to do is, you know, safe and I'm able to function and do it safely." (*Id.* 46:21-25).

**Mr. Hoover Begins Experiencing Knee Pain Doing Yard Job and Seeks Treatment in 2015**

Mr. Hoover's complaint against his employer relates to working mainly in the yard as a car inspector, allegedly causing his knee problems, ultimately resulting in bilateral knee arthroscopy beginning in December 2017.  (*Id.* 75: 2-12; 80:5-82:11).  Mr. Hoover admits that he had discomfort in his knees through the years, walking on ballast and mounting/dismounting railcars. (*Id.* 75:22-76:2).  It was not until he was in his fifties when he began complaining to his doctors about his knee symptoms.  (*Id.* 261:25-262:12).  He experienced pain when walking and testified that he became "more aware" of the pain "around 2016."  (*Id.* 75:13-21).  He also describes having to jack railcars in the yard pocket track while the RIP Track was temporarily closed in 2016 as "contribut[ing] the most to [his] knee symptoms."  (*Id.* 223:15-226:12).

Despite claiming he was "more aware" of his knee pain in 2016, his memory was refreshed in his deposition by a June 2015 medical record, in which he actually sought treatment for aching pain in both knees and told his doctor it was aggravated by walking.  (*Id.* 77:5-80:4, 250:14-251:2

10

and Exhibit 4: Medical record).  He testified: "Q.  So from and after June 18th, 2015, you knew that walking in the yard and inspecting cars was aggravating your knees, true? A.  I would say probably recognized it more, yes, sir. . ." (Hoover Dep. 78:1-5).

Discussing an orthopedic record of November 27, 2017, Mr. Hoover admitted that his knees had been hurting for years.  (*Id.* 79:7-80:4).  Hoover testified:  "Q. And you believe in your own mind that walking on these rocks and getting up and down on these cars was causing your knees to hurt, true? A. I would say it probably aggravated them some, yes, sir." (*Id.* 79:7-80:4; see also, Exh. 4: Medical Record of June 18, 2015). In January 2018, after his arthroscopies, Mr. Hoover's orthopedic surgeon discussed with him that Plaintiff's job was strenuous, and he would likely have symptoms down the road with both knees; Mr. Hoover acknowledged that he would try to modify his activities.  (Exhibit 5: Dr. Smith record and Carman Job Duties).

Despite this awareness that he had had surgery on both knees causing him pain for years when walking on ballast and mounting and dismounting railcars, which he specifically told his doctor about in June 2015, and which he was later told by his surgeon would continue to cause him symptoms due to his "strenuous" job, Plaintiff did not file suit until July 7, 2019-at least one year too late.  (Complaint, Doc. 1).

**Return to Work Medical Compliance and Safety**

After his December 2017 knee surgeries, a medical services clinician with NS worked with Mr. Hoover and his surgeon to evaluate and return Mr. Hoover to work, which Mr. Hoover agrees was a reasonable thing to do.  (Hoover Dep. 84:7-92:9 and Exhibit 5).  Mr. Hoover completed training and orientation he needed to safely return to work.  (*Id.* 94:16-96:23; Exh. 11).  Mr. Hoover agrees that safety and an injury-free workplace is a top priority at Norfolk Southern.  (*Id.* 96:1-23).

**April 2018 Dismount Claim Event**

Mr. Hoover worked April 1st, April 2nd, April 3rd, and April 4th, 2018, before he stepped off a railcar, claiming re-injury of his knee.  (Complaint; Hoover Dep. 95:17-23 and Exhibit 7: Incident Report and Personal Injury Report).  Mr. Hoover promptly reported his incident to his supervisor, Mr. Mike Chambers, a carman himself, who investigated the accident that evening and the next day.  (Exh. 7:  Incident Report; Chambers Depo. 70:14-89:17).  Mr. Hoover was accurate when he reported his incident to Mr. Chambers.  (Hoover Dep. 108:2-15, 109:15-20).  In describing Mr. Chambers, Mr. Hoover testified that they get along, he has no reason to doubt Mr. Chambers is trustworthy and credible, and when asked if Mr. Chambers was a good competent carman/supervisor, Mr. Hoover said, ". . .he knows his stuff. . .I think he's pretty sharp. . ." (*Id.* 64:8-65:4).

As reflected in the Incident Report, Mr. Hoover agrees that more likely than not he mounted and dismounted trains from April 1st through 4th.  (*Id.* 103:25-104:12).  On April 4th, he was assigned to perform a Class I night outbound inspection on 34 railcars for train M44 in the receiving yard track 12. (*Id.* 105:16-106:5 and Exh 7: Incident Report).  He had already had a safety meeting and participated in the safety meeting and stretches without incident.  (Hoover Dep. 100:5-8, 112:25-114:25 and Exh. 7: Incident Report)  It was night, and Mr. Hoover was using his personal protective equipment as well as a handheld flashlight and a headlight on his helmet. (Hoover Dep. 221:17-22).  Mr. Hoover walked the train alone while his coworker, another carman, was on the pocket 13 track repairing air brakes on a car.  (*Id.* 114:23-115:17).

Mr. Hoover discovered a bulging plug door on 23rd railcar, TBOX 640023, mounted the B-end using the subject side ladder, and applied a bad order card on the left (north) side of the car.

12

(*Id.* 115:18-117:14)  Here is a photograph of the subject boxcar[5] and photographs of the B-end

("B-end" is the end of the car that has a handbrake) of the boxcar in place on track 12 the next day

(with the plug door defect circled in red):



(Hoover Dep. 139: 11-20 and Exhibit 3 photographs including marked depo. exhs. 10 (southside

view of boxcar on track 12), 11 (B-end northside view on track 12), 12 (B-end with plug-door

---

[5] Each and every one of the photographs submitted in this Motion for Summary Judgment, collective Exhibit 3, are of the subject boxcar in the place it was at the time of Plaintiff's accident.  Plaintiff would not verify any photograph of the subject boxcar or the dismount surface ballast, except the marked "Exhibit 10" photograph.  Yet, we know this is the same car in the same location for two reasons.  1) Among other identifiers, including the boxcar number in some photos, the defect Plaintiff detected distinctively identifies the boxcar (see, Chambers Depo., 84:7-25 and marked exhibits 12,18, and 29 photographs).  2) Mr. Chambers investigated the incident, interviewed Plaintiff on the night of the incident, including obtaining the boxcar number, inspected and photographed the boxcar in place on the night of the incident, returned to the location the next day in daylight to re-inspect, directed and observed photographing of the car and area, and took measurements of the same boxcar still in the same place, and contemporaneously memorialized his investigation in the incident report.  He verified that the photographs are of the subject boxcar and ground surface.  (Chambers Depo., 70:14-89:17 and Exh. 7: Incident Report).

defect circled), and 18 (B-end northside view on track 12 with wedge at plug-door defect circled in black)). He crossed over the B-end of the car, dismounted using the ladder, and applied a bad order tag on the other side of the car. (Hoover Dep. 118:4-20). He did not feel any pain or have any incident to this point. (*Id.* 119:6-120:12).

Mr. Hoover then re-mounted the boxcar, crossed over the B-end again, and dismounted the boxcar, leading from the lowest sill step of the ladder with his left foot, looking at the ground; when his foot touched the gravel, the left knee gave out, he felt it pop, and he felt pain. (Hoover Dep. 110:18-111:19, 115:18-116:2, 119:6-120:12; 121:13-123:14 and Exh. 7: Incident Report and Personal Injury Report). Mr. Hoover did not expect this would happen. (Hoover Dep. 120: 13-121:4).

Mr. Hoover was wearing all appropriate personal protective equipment, with his boot soles in good condition with no signs of foreign substance on the treads. (*Id.* 148:6-149:2; Exh. 7). Mr. Hoover had performed a self-job-briefing and visually inspected the grab irons and crossover walkboard prior to mounting the railcar. (Hoover Dep. 123: 18-22). He maintained three points of contact with the railcar ladder when mounting and dismounting the railcar and knew to look down at the ground prior to dismounting. (*Id.* 123:23-125:23). He fully complied with Norfolk Southern's Rule 1070 (a) and (b) "Getting On or Off Equipment." (Hoover Dep. 124:5-24; Exhibit 10: Rule 1070). He was not in a hurry and was "just doing my normal walking and inspecting." (Hoover Dep. 126:9-21). He did not slip, trip, or fall prior to or after dismounting. (*Id.* 126:16-21). He was dismounting in the ordinary way as Norfolk Southern trained him and instructed him to do. (Hoover Dep. 126:22-127:1; Chambers Dep. 29:4-19 (explaining mount/dismount/cross-over procedure and three point contact) and 87:21-88:5). When Mr. Chambers asked him if there was anything he could have done differently to prevent the injury, Mr. Hoover said, "No, I

dismounted the car like I always do. My knee just gave out." (Hoover Dep. 127:2-16 and Exh. 7: Incident Report).

The boxcar was a new November 2017 model, built less than six months before the incident. (Exh. 7: Incident Report; Chambers Dep. 73:17-24). The boxcar was inspected by competent fellow union carmen, according to Mr. Hoover, just after Mr. Hoover's incident, and the only defect on the boxcar was the door bulge, first identified by Mr. Hoover. (Hoover Dep. 128:13-130:14, 131:23-25 and Exhibit 8: ME-604 Car Inspection form; Chambers Depo.: 74:11-75:1; 84:7-25).

Mr. Hoover stepped from the bottom sill. (Hoover Dep. 132: 10-15). At a distance of 21 inches to 22.5 inches[6] above the top of the rail on track 12, this sill step was compliant with FRA regulation 49 C.F.R. § 231.27, as actually measured by Mr. Chambers. (Exh. 7: Incident Report; Chambers Depo. 45:11-49:15, 75:2-78:6; Exhibit 3: Photographs, marked in depo as "Exhibit 23"; Exhibit 9: FRA Regulation 49 CFR § 231.27 ("Tread shall be not more than 24 inches, preferably not more than 22 inches above the top of the rail."). There is no evidence in this case that this sill step, or any sill step of any railcar that Mr. Hoover mounted or dismounted, was not compliant with federal regulation.[7] Mr. Hoover told Mr. Chambers that he took no exception to the condition

---

[6] Plaintiff's counsel quibbled about the photographic distance measurement, but, nonetheless, the distance is regulatory compliant under any interpretation of the evidence.

[7] Although carrying a tape measure was part of his job (Dep. 206:22-24), Mr. Hoover has never measured the distance of any sill step of any car to the rail/ground surface. (Hoover Dep. 205:5-14). He admits that without measuring, he cannot say whether any sill step of any railcar was non-compliant with FRA regulations. (Hoover Dep. 204:22-206:24). Mr. Hoover agrees that railcars are manufactured to comply with FRA regulations. (Hoover Dep. 160:12-24; see also, Chambers Dep. 74:3-9). Mr. Hoover agreed that, as a part of his job, he would have bad ordered the railcar if the sill step were defective, loose, bent, or non-compliant with the FRA regulation. (Hoover Depos., 160:25-161:18). He has bad ordered a car for having a sill step not in compliance with the FRA regulation. (Hoover Depos., 198:24-199:7). He is not supposed to mount a car with a non-compliant sill step. (Id.).

of TBOX 640023" other than the bad order door. (Exh. 7: Incident Report; Hoover Dep. 132: 16-20; Chambers Dep. 80:24-81:21).[8]

When he reported his accident, Mr. Hoover took no exception to the ground surface. (Chambers Dep. 80:18-23, Exh. 7: Incident Report). When Mr. Chambers inspected it just after the accident, the ground surface was "ideal" – "level, consisted of compacted walking stone, and was free of debris" and "excellent." (Exh. 7: Incident Report; Chambers Depo. 80:6-17, 86:5-87:20; Photographs; Hoover Dep. 134:13-19 (agreeing the ground surface was yard walking ballast or chip but unsure if compacted or loose rock)). Mr. Hoover speculated that the ballast at the point where he placed his foot "may be a little low." (Hoover Dep. 142:23-144:9; but see collective Exh. 3 at marked "Exhibit 29" photograph). His contemporaneous statement, taking no exception to the ground conditions and the photographic evidence of smooth ballast proves otherwise, however. Here are Mr. Chamber's photographs of the box car and sill step in place the evening of the accident and the next day, which he testified accurately depict the condition of the ground (see, *supra* footnote 5 and photographic exhibits, collective Exh. 3):

 

---

[8] Mr. Hoover does not recall one way or the other whether Mr. Chambers asked him about the condition of the sill step. (Hoover Dep. 133:19-22).

16

16

Case 3:19-cv-00250-TAV-DCP   Document 32   Filed 01/15/21   Page 16 of 35   PageID #: 289

of TBOX 640023" other than the bad order door. (Exh. 7: Incident Report; Hoover Dep. 132: 16-20; Chambers Dep. 80:24-81:21).[8]

When he reported his accident, Mr. Hoover took no exception to the ground surface. (Chambers Dep. 80:18-23, Exh. 7: Incident Report). When Mr. Chambers inspected it just after the accident, the ground surface was "ideal" – "level, consisted of compacted walking stone, and was free of debris" and "excellent." (Exh. 7: Incident Report; Chambers Depo. 80:6-17, 86:5-87:20; Photographs; Hoover Dep. 134:13-19 (agreeing the ground surface was yard walking ballast or chip but unsure if compacted or loose rock)). Mr. Hoover speculated that the ballast at the point where he placed his foot "may be a little low." (Hoover Dep. 142:23-144:9; but see collective Exh. 3 at marked "Exhibit 29" photograph). His contemporaneous statement, taking no exception to the ground conditions and the photographic evidence of smooth ballast proves otherwise, however. Here are Mr. Chamber's photographs of the box car and sill step in place the evening of the accident and the next day, which he testified accurately depict the condition of the ground (see, *supra* footnote 5 and photographic exhibits, collective Exh. 3):

 

---

[8] Mr. Hoover does not recall one way or the other whether Mr. Chambers asked him about the condition of the sill step. (Hoover Dep. 133:19-22).

16

Case 3:19-cv-00250-TAV-DCP   Document 32   Filed 01/15/21   Page 16 of 35   PageID #: 289

Having indisputable proof of the sill step regulatory compliance and the smooth ballast ground surface, there has been no negligence on Mr. Hoover's part or Norfolk Southern's part, as Plaintiff himself testified:

> Q.  So basically what happened was you didn't do anything wrong nor did Norfolk Southern do anything wrong that caused your accident of April the 4th, 2018 to happen, true?
> A.· · ·Like I said, unless the distance we're measuring. . .was off and it was a farther step than was required --and it's, you know, a pretty long step down.· But, I mean, I did everything right.· Now, but as far as if the ballast and everything is at the right height, I'm just not as sure of that.
> Q.· · ·Right.· But if I can prove that it was at the right height, then Norfolk Southern didn't do anything wrong and you didn't do anything wrong, true, if I can prove it?
> A.· · ·Like I said, if you could prove everything right, I mean, as far as just everything being correct and stepping down -- I mean, even at the right height it may not -- you know, still not have prevented my knee from doing what it did.
> * * *
> Q.· · ·What happened is the good Lord decided that based upon your anatomy that that move that you made caused that discomfort to happen, and it's a part of your body that caused that to happen?[9]
> A.· · ·I don't know if it was the particular move because you step straight down, you know.· It's one of those things.
> Q.· · ·Yeah, one of those things.· Of course, you and only you were in control of your body movements when you dismounted that car?
> A.· · ·Correct.
> Q.· · ·Norfolk Southern was not in control of your body movements when you --
> A.· · ·They are not -- no, sir, they're not in control of my body.· Huh-uh.
> Q.· · ·Right.· All Norfolk Southern can do is to provide you with a reasonably safe place to work when you were doing your dismount, right?
> A.· · ·Correct.· Yeah, that's their job to provide us a safe place to work and everything within compliance.
> Q.· · ·And if I can prove, Norfolk Southern can prove, that that sill step complied with 49 CFR 231.27, then in that event Norfolk Southern was not negligent in any way?
> * * *
> A.· · ·Right.· Hypothetically, if everything's lined out [] just right and you step down, it's one of them things that, you know, happened.

(Hoover Dep. 162:9-164:15).

---

[9] Mr. Hoover reported weighing 250 pounds at the time.  (Hoover Dep. 111:20-112:13 and Exh. 7:  Incident Report ( reporting 250 pounds)).

## LEGAL ARGUMENT

I.     **FELA Cases Can Be - and This One Should Be - Summarily Dismissed.**

Since this Court and all counsel are very familiar with the negligence based federal FELA statute and with the summary judgment standard, in the interest of brevity, NS will forego discussion of the oft-quoted basic tenets of the doctrines.  We simply make a brief point – although a remedial statute, FELA cases can be summarily dismissed.  Magistrate Guyton's dismissal in *Cottle* is a perfect example.  The procedural standards for a FELA case remain the same as in all other negligence actions, that is, a plaintiff must show that he has evidence to support his burden of proof at trial: (1) duty, (2) foreseeability, (3) breach, (4) causation, and (5) damages. *Fulk v. Illinois Central R.R. Co*., 22 F.3d 120, 124 (7th Cir. 1994).  Throughout FELA's history, courts have dismissed FELA cases summarily if the plaintiff is unable to come forth with sufficient evidence on any one of his essential elements. *Lisek v. Norfolk & Western Ry. Co*., 30 F.3d 823 (7th Cir. 1994).  Liability must be proven, it is not **presumed**. *Moore v. Chesapeake, Ohio Ry Co.,* 340 U.S. 573, 578 (1951) ("Speculation cannot supply the place of proof."); *Van Gorder v. Grand Trunk W. R.R*., 509 F.3d 265, 269 (6th Cir. 2007) ("FELA does not lessen a plaintiff's burden to prove the elements of negligence.").  A plaintiff must prove by admissible fact that his employer was at fault in causing his damages. *Tennant v. Peoria & Pekin Union Ry. Co*., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (1944), reh. denied, 321 U.S. 802 (1944).  Time-barred actions – including this FELA lawsuit - must be dismissed.  45 U.S.C. § 56; *National R.R. Passenger Corp. v. Krouse*, 627 A.2d 489, 493, 1993 D.C. App. LEXIS 151, *9 (D.C. June 21, 1993) (emphasis added) ("An action cannot be maintained under the FELA unless commenced **within three years from the date the cause of action accrued**.").  Summary judgment remains a viable and legitimate exercise of a court's power - even in FELA cases.

II.  **Plaintiff's Cumulative Claims and Dismount Claim Are Time-Barred Because Plaintiff's Work-Related Symptoms Manifested, at the Latest, in 2015 - More Than Three Years Before He Filed the Instant Action.**

At the outset, it must be emphasized that NS vehemently denies the allegations set forth by the Plaintiff. (See Answer generally). At all times relevant, NS took all reasonable measures and precautions to ensure that it provided Mr. Hoover with a reasonably safe place to work, which he admits as the activities are "just part of the job" of being a carman.  For purposes of this motion, assuming Plaintiff's allegations are accurate, as stated, the objective and undisputed facts clearly and unequivocally show that Mr. Hoover's cause of action began to accrue well before three years prior to his filing suit in July 2019, and, thus, his claims are time-barred.

45 U.S.C. § 56 states in part that "[n]o action shall be maintained under this chapter unless commenced ***within three years*** from the day the cause of action accrued."  Instead of the general "time-of-the-event rule," which is applied in cases of an immediately manifest injury, in alleged cumulative trauma cases, the "discovery" rule applies.  *Young v. Clinchfield R. R.*, 288 F.2d 499 (4th Cir. 1961) ("…with industrial diseases, where the symptoms are not immediately manifested, the cause of action does not accrue until the employee is aware or should be aware of his condition."); *see also, Harris v. CSX Transp., Inc*., 2013 U.S. Dist. LEXIS 14861, *7 (W.D.N.Y. Feb. 4, 2013) ("Where, as here, there is a gradual injury with no exact injury date, the Supreme Court has adopted a 'discovery-of-the-injury' rule").

"Under the discovery rule, the action accrues when the injured party knew or, in the exercise of reasonable diligence, should have known the factual basis for the cause of action." *Attallah v. United States*, 955 F.2d 776, 780 (1st Cir. 1992); *Mounts v. Grand Trunk Western R.R.*, 198 F.3d 578, 581 (6th Cir. Ohio Jan. 5, 2000) ("a cause of action 'accrues' when an employee knows of the injury and its cause.").

Manifestation of injury has long been the accrual point. *Urie v. Thompson*, 337 U.S. 163, 170 (U.S. May 31, 1949). The "discovery" rule was further refined by the U.S. Supreme Court in *United States v. Kubrick*, 444 U.S. 111 (1979), to require plaintiff's to make reasonably diligent efforts to ascertain the cause of injury through seeking out advice from the medical and legal community because: "To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims. . ." *Id*. at 123.

Put simply by the Tennessee courts, applying federal FELA law, the statute of limitations "begins to run as soon as the injured party is 'in possession of the critical facts' necessary to discover that a potential cause of action exists—namely, 'that he has been hurt and who has inflicted the injury.'" *Hensley v. CSX Transp., Inc*., 278 S.W.3d 282, 288 (Tenn. Ct. App. 2008) (quoting *Kubrick*, 444 U.S. at 122). This mandates that "an affirmative duty to investigate one's symptoms and their causes arises when a claimant 'should have known' that such an investigation was needed; in these cases, the statute of limitations will 'start . . . to run when a reasonable person would know enough to prompt a deeper inquiry.'" *May v. Ill. Cent. R.R. Co*., 361 S.W.3d 511, 516 (Tenn. Ct. App. 2011).[10]

---

[10] The Court must apply a reasonable person, in like circumstances, standard in determining whether the injured employee is in possession of the critical facts to ascertain the cause of his injury. *See Wells v. Norfolk S. Ry.,* 1997 U.S. App. LEXIS 4347, *7 (6th Cir. Tenn. Mar. 6, 1997) ("A reasonable person in Wells position would have realized, or would have taken steps to find out, that the injury was work related"); *Whitman v. CSX Transp.,* 887 F. Supp. 983, 993 ( E.D. Mich. May 30, 1995) ("the court finds, as a matter of law, that an objectively reasonable person in the plaintiffs position would have realized that his hearing loss was related to his employment by the defendant railroad"). Thus, it is necessary that an injured employee exercise a level of reasonable diligence in ascertaining the cause of his injury. *See Fonseca v. CONRAIL,* 246 F.3d 585, 590 (6th Cir. Ohio Apr. 4, 2001); *Henry v. Norfolk S. Ry. Co.*, 605 Fed. Appx. 508, 511 (6th Cir. Ohio Mar. 24, 2015) ("the fact that an injury has not reached its maximum severity . . . but continues to progress does not relieve the plaintiff of the duty to use reasonable diligence to discover the original injury and its cause").

In short, as the extensive body of law on this subject explains,[11] the threshold question that must be answered in the present case is when Mr. Hoover first knew or should have known of the critical facts to prompt further inquiry with a lawyer or a doctor that he had a potential cause of action against his employer:  (a) that he was developing a degenerative knee condition; and (b) that the knee condition resulted, in whole or part, by his employment with NS.

Plaintiff sought medical treatment for aching knees in 2015, which he told his doctor was aggravated by walking, and took medication for this pain.  (Exh. 4:  June 15, 2018 Medical Record).  It is important to emphasize that "[t]he test for statute of limitations purposes is not necessarily whether a formal diagnosis has occurred." *Russell v. Ill. Cent. R.R.*, 2015 Tenn. App. LEXIS 520, *58 (Tenn. Ct. App. June 30, 2015); *McNutt v. CSX Transp., Inc*., 2010 U.S. Dist. LEXIS 40463 (W.D. KY Apr. 26, 2010) ("A medical diagnosis … is not required for a plaintiff to reasonably know that his injury is possibly related to his work."); *Swindell v. Fla. E. Coast Ry*., 2005 U.S. Dist. LEXIS 21544, *18 (M.D. Fla. 2005) (where plaintiff believed he had a lung injury, aware of symptoms, and treating for several years, holding, "the statute of limitations commences when the injury is noticed and before it reaches maximum severity, not when it is later diagnosed.").

Plaintiff had discomfort for years while doing his work activities, (Hoover Dep. 75:22-76:2), but did not have surgery until 2017.  (*Id.* 75:2-12; 80:5-82:11).  Recognition of the seriousness of injury, aggravation of injury, or full manifestation of injury does not start (or re-

---

[11] *United States v. Kubrick*, 444 U.S. 111, 120-21 n.7, 100 S.Ct. 352, 62 L.Ed. 259 (1979); *Urie v. Thompson*, 337 U.S. 163, 170, 69 S.Ct. 1018, 1025, 93 L.Ed. 1282 (1949); *Hicks v. Hines, Inc*., 826 F.2d 1543, 1544 (6th Cir. 1987); *Wells v. Norfolk Southern Railway Co*., No. 96-5267, 1997 WL 103319 (6th Cir. March 6, 1997); *Matson v. Burlington Northern Santa Fe Railroad*, 240 F.3d 1233; 2001 U.S. App. LEXIS 2564 at *6-7 (10th Cir. Feb. 21, 2001); *Tolston v. National R.R. Passenger Corp*., 102 F.3d 863, 865 (7th Cir 1996); *Voytko v. Consolidated Rail* Corp., 94 F.3d 645 (6th Cir 1996); *Aparicio v. Norfolk and Western Ry. Co*., 84 F.3d 803, 814 (6th Cir. 1996); *Caputo v. CSX Transportation, Inc*., 70 F.3d 1271, 1995 WL 699622 (6th Cir. 1995); *Bealer v. Missouri Pacific R. Co*., 951 F.2d 38, 39 (5th Cir. 1991); *Fries v. Chicago and Northwestern Transp. Co*., 909 F.2d 1092, 1095 (7th Cir 1990); *Whitman c. CSX Transp., Inc*., 877 F. Supp. 983 (E.D. Mich. 1995).

start) the statute of limitations clock. *Ragland v. BNSF Ry. Co.*, 501 S.W.3d 761, 777, 2016 Tex. App. LEXIS 10134, *34 (Tex. App. El Paso Sept. 14, 2016) ("a plaintiff's cause of action begins to accrue when the first symptoms of the injury manifest itself, regardless of whether new symptoms manifest in the future."); *Hicks v. Hines, Inc.*, 826 F.2d 1543, 1544 (6th Cir. Ky. Sept. 2, 1987) (*quoting Albertson v. T. J. Stevenson & Co., Inc.*, 749 F.2d 223, 229 (5th Cir. 1984)) ("[e]ven if 'the plaintiff later discovers that his injuries are more serious than he originally thought, his cause of action nevertheless accrues on the earlier date, the date he realized that he had sustained harm from the tortious act.'"); *Mounts*, 198 F.3d at 581 (*citing Aparicio v. Norfolk W. Ry. Co.*, 84 F.3d 803, 815 (6th Cir. 1996) and adopting rationale of the Seventh Circuit Court of Appeals) ("Any 'aggravation' of the original negligently caused injury would only affect the plaintiff's damages, and would not require a separate determination of liability or causation. Furthermore, a rule permitting severability of a claim that an original, continuing injury has been aggravated would contravene the purpose of the discovery rule articulated in *Urie* requiring Federal Employers' Liability Act plaintiffs to use reasonable diligence to discover the cause of an injury once the injury manifests itself.")

Plaintiff admits that from and after June 18, 2015 (at the latest), he knew that walking in the yard and inspecting cars aggravated his knees. (Hoover Dep. 78:1-5). A similar case is *Fleming v. CONRAIL*, 1998 U.S. App. LEXIS 29574 (6th Cir. Ohio 1998). From 1976 through 1989, the Mr. Fleming was employed as a trackman, which required him to manually operate heavy machinery. *Id.* at *2. In the 1980s, he began to experience numbness and the feeling of pins in his hands during the workday, but did not seek treatment for these symptoms until 1993, when he was diagnosed with carpal tunnel syndrome caused by his work at the railroad. *Id.* He did not file suit until 1996. *Id.* The Court found, like here, that "[plaintiff] was aware of the symptoms of

his syndrome in the 1980s and, further, that the work he performed for [the railroad] was the cause of those symptoms." *Id.* at *7 (emphasis added). His FELA suit was time-barred.

Mr. Hoover's knees hurt "for years." (Hoover Dep. 79:7-80:4). They bothered him so badly that he talked to his doctor in June 2015 and was put on prescription medicine. (Exh. 4: June 15, 2018 Medical Record). He told his doctor then that the pain was aggravated by walking – an activity he did a lot of in his job. (*Id.*; see also, Exh. 5: Carman Job Tasks). He testified that he was actually aware that the pain was aggravated by all of his work activities-squatting, climbing, kneeling, and walking on ballast rock. (Hoover Dep. 75:22-76:2, 79:7-80:4). Symptoms had clearly manifested, and Mr. Hoover knew these symptoms were likely related (even if by aggravation only) to his work. (*Id.*). He absolutely knew this to be so from and after June 15, 2018. (*Id.* at. 78:1-5). It does not matter that occasionally lifting heavy jacks and jack pads in the pocket track for 14 months from April 2016 to December 2017 exacerbated his knee condition. It does not matter that when he returned to work, and dismounted from a railcar in April 2018, he tweaked his already injured knee. He did not have to wait for surgery. The trigger date was long before his surgeon told him in January 2018 that his condition would remain symptomatic due to his "strenuous" job. (Exh. 5: Smith Record). It is true Mr. Hoover needed to lose weight, and that he walked and did other activities apart from work, but "the injured plaintiff need not be certain which cause . . . is the governing cause but only need know or have reason to know of a **potential** cause." *Matson*, 2001 U.S. App. LEXIS 2564 at *9 (quoting *Fries*, 909 F.2d at 1095) (emphasis added); *see also, Reed v. CSX Transp., Inc.*, 1993 WL 475971, 12 F.3d 205 (Table) at *21 (4th Cir. Nov. 17, 1993) (cause of action untimely where FELA plaintiff knew he had hearing loss and only significant noise in life was employment with railroad, citing both *Fries* and *Kubrick* for

23

proposition that FELA plaintiffs may not avoid statute of limitations by failing to seek diagnosis or investigate cause).

Mr. Hoover reasonably should have known, and did know, in June 2015 (at the latest) that he had injured his knees related, in part, to his work where he had the most significant use of his knees. In the very least, that date compelled diligent inquiry. He should have filed suit by June 15, 2018. His lawsuit is too late and must be dismissed.

III.  **Mr. Hoover's Claims of Injury Caused by Mounting and Dismounting Railcars and Walking on Yard Gravel Ballast, Including Specifically His 2018 Dismount Claim, Must Be Dismissed Because NS Can Not Be Negligent for Compliance with Federal Regulation**.

Notwithstanding that the statute of limitations bars this action entirely, federal law precludes (preempts) Mr. Hoover's claims regarding mounting and dismounting railcars and walking on ballast because the railroad complied with federal regulatory law, and there is no evidence to the contrary.

A. **Overview of the Preclusion Doctrine**.

Preemption occurs when a federal law overrides or is in conflict with a state statute or common law. The federal law prevails and preempts the state law. U.S. Constitution, Art. VI, Cl. 2; *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L. Ed. 2d 567, 595 (1981). In a similar vein, preclusion occurs when two federal statues conflict. The legal analysis is similar whether preemption or preclusion applies. *Horton v. Norfolk Southern Corp.*, 102 F. Supp. 2d 330, 335 (M.D.N.C. 1999); see also *Felt v. Atchison, Topeka & Santa Fe Ry. Co*., 60 F.3d 1416 (9th Cir. 1995) (preemption *per se* does not apply concerning the interrelationship between two federal laws, but the preclusion analysis is similar to the preemption analysis and both are a question of congressional intent.) If a federal regulation covers the subject matter raised in this lawsuit,

preclusion applies, and Mr. Hoover's claim must be dismissed. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).

B. **The SAA and FRSA Govern Here**.

With these precepts in mind, we turn first to the Safety Appliance Act ("SAA"), which Mr. Hoover did not plead but is nevertheless applicable here. The SAA, 49 U.S.C. § 20301, *et seq*., requires rail cars to be equipped with enumerated safety features, for example, certain types of couplers, brakes, running boards, and handholds. The SAA provides that a vehicle must have "secure ladders and running boards when required by the Secretary of Transportation, and, if ladders are required, secure handholds or grab irons on its roof at the top of each ladder." 49 U.S.C. § 20302(a)(1)(C). The U.S. Supreme Court has long held that the SAA occupies the entire field with respect to the requirements for safety devices covered under the Act. *See S. R.R. v. R.R. Comm'n of Ind.*, 236 U.S. 439 (1915). Accordingly, courts preclude (preempt) claims dealing with those named safety devices of railcars – including ladders and sill steps. *Atchison, Topeka & Santa Fe Ry. Co. v. Scarlett*, 300 U.S. 471, 472 (1937) (FELA claims related to slip from compliant railcar ladder precluded by SAA); *Toadvine v. Norfolk S. Ry. Co.*, Nos. 96-6221/96-6237, 1997 U.S. App. LEXIS 32292, 1997 WL 720431 (6th Cir. Nov. 12, 1997) (product liability claim related to placement of ladders and handholds on rail car preempted); *Miller v. S. Pac. R.R.*, No. S-06-377, 2007 U.S. Dist. LEXIS 66314, 2007 WL 2669533 (E.D. Cal. Sept. 7, 2007) (SAA and FRSA preempt claims related to operating platform); *Feldman v CSX Transp. Inc.*, 31 A.D.3d 698 (N.Y. App. 2006) (SAA preempts claim of defective design of hopper car, but not claim for negligent failure to comply with regulation); *see by analogy*, *Key v. Norfolk Southern Ry. Co.*, 491 S.E.2d 511 (Ga. App. 1997) (Locomotive Inspection Act, which also occupies the field, precludes FELA claim alleging negligent design of locomotive steps.)

25

To achieve the goal of uniformity through national standards and occupation of the field of railcar appurtenance safety, the FRA has promulgated a regulation dealing with sill step dimensions and heights on boxcars, which in relevant part reads: "(c) Sill steps - (iii) Tread shall be not more than twenty-four (24), preferably not more than twenty-two (22) inches above the top of rail." 49 C.F.R. § 231.27 (c)(3)(iii) (collective Exhibit 9).

The United States Supreme Court has long held that compliance with SAA regulations precludes FELA claims. In *Atchison, Topeka & Santa Fe Ry. Co. v. Scarlett*, the Court considered whether a worker could sue the railroad after he slipped off a box car ladder. 300 U.S. 471, 472 (1937). The key issue was whether the ladder conformed to federal safety rules promulgated under the SAA. Because (as here) the ladder did comply, the claim failed: "[T]he railway company having strictly complied with the regulation has discharged its full duty so far as the ladder requirement of the Safety Appliance Act is concerned. The judgment of the trial court and jury cannot be substituted for that of the [federal regulator]." *Id*. at 474. *Scarlett* cited with approval a series of earlier cases holding that "when the [rail] carrier complies with the requirements of the [regulation], …and therefore the act of Congress, it cannot be found guilty of actionable negligence because the plaintiff or a jury might think ordinary care required something additional." *Mahutga v. Minneapolis, St. P. & S.S.M. Ry. Co*., 234 N.W. 474 (Minn. 1931) (cited at 300 U.S. at 474).

Next, we turn to the Federal Railroad Safety Act ("FRSA"). In 1970 Congress enacted the FRSA "to promote safety in every area of railroad operations...." 49 U.S.C. § 20101. The FRSA establishes a policy of national uniformity of laws, regulations, orders, and standards relating to railroad safety. 49 U.S.C. § 20101.

To further achieve the goal of national uniformity, the FRSA granted the Secretary of Transportation broad powers to prescribe standards for all areas of railroad safety including track

structure. 49 U.S.C. § 20106. The Secretary of Transportation, via the FRA, is responsible for promulgating and enforcing these regulations. The FRA, in turn, drafted rules in the Code of Federal Regulations that specifically relate to rock ballast. 49 C.F.R. § 213.103 (collective Exhibit 9) provides:

> Unless it is otherwise structurally supported, all track shall be supported by material which will-
> (a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;
> (b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;
> (c) Provide adequate drainage for the track; and
> (d) Maintain proper track cross level, surface, and alignment.

This rule governs all railroads, including NS. It mandates the use of ballast under and near rail track.

The SAA *Scarlett* opinion cited above, compelling uniformity in railroad safety, supports this Circuit's *Nickels* decision, which is considered the seminal decision in this area of law. *Nickels v. Grand Trunk R.R., In*c., 560 F.3d 426, 433 (6th Cir. 2009). *Nickels* involved two separate FELA cases. The employees complained that their railroad employers were negligent by using large mainline ballast underneath and adjacent to tracks receiving heavy foot traffic. *Id*. at 428. They claimed that walking on the large rock caused them to suffer physical injuries. *Id*.

In both cases the railroads moved for summary judgment. They argued that the FRSA (49 U.S.C. § 20101) and the FRA's regulation regarding ballast (49 C.F.R. Part 213.103) precluded the plaintiffs' FELA claims. *Id*. The district courts granted the railroads' motions, concluding that the plaintiffs' FELA common law claims would undermine the FRSA's express goal of national uniformity in railroad safety regulations. *Id*. If they prevailed in a trial, the result would be that

using mainline ballast is not appropriate - a direct contradiction to the federal statutes.  In affirming

the dismissals, the Sixth Circuit stated:

> The Secretary has promulgated a regulation on ballast. . .49 C.F.R. § 213.103. The question is whether this regulation covers the subject matter of the plaintiffs' claims. The gist of [their] claims is that the railroads used large mainline ballast in areas where smaller yard ballast would have sufficed such as passing sidings, switch leads, and interior yard tracks. The regulation, however, makes no distinction between mainline and secondary track; it provides that "all track shall be supported by material" able to transmit and distribute track and equipment loads, restrain the track under dynamic loads and thermal stress, provide adequate drainage, and maintain proper track crosslevel, surface, and alinement [sic]. Id. . .. Rather than prescribing ballast sizes for certain types or classes of track, the regulation leaves the matter to the railroads' discretion so long as the ballast performs the enumerated support functions. In this way, the regulation substantially subsumes the issue of ballast size.

*Nickels*, 560 F3d at 430-431 (quotation marks and emphasis in original).

C. **NS Met the SAA and CFR Standards for Sill Steps and the FRSA and CFR Standards for Ballast, and There is No Contrary Evidence**.

Mr. Hoover alleges generally (Cumulative Claims) and specifically (Dismount Claim) that

stepping from a non-defective boxcar sill step and walking on this yard (small gravel) track support

ballast caused his knee problems. However, the SAA and FRSA and the boxcar sill step and ballast

regulations, cited above, set the absolute standard of care for railroads.  If NS complied with the

regulations, it has not breached its duty to Mr. Hoover to provide him with a reasonably safe

workplace.  Put simply, if boxcar sill steps are less than 24 inches above the rail and if

gravel/ballast is adjacent to and supporting the track, the Court, as a matter of law, must dismiss

Mr. Hoover's claims.  *Scarlett*, *supra,* 300 U.S. at 472 (FELA ladder claims precluded by SAA).

*Nickels, supra*, 560 F.3d at 433 (FELA ballast claims precluded by FRSA).

**Dismount Claim**

The determinative question is this: On April 4, 2018, did NS's boxcar sill step and yard (small gravel) ballast comply with 49 C.F.R. § 231.27 (sill step less than 24 inches above the rail) and 49 C.F.R. § 213.103 (ballast as track supportive)? The answer is yes.

Uncontroverted direct, non-circumstantial evidence confirms compliance. Photographic evidence (Exhibit 3) shows a smooth ballast dismount surface, free of debris. Mr. Chambers, who inspected that very night, reported in his Incident Report, and testified that the gravel surface was "ideal." (Exh. 7: Incident Report; Chambers Dep. 80:6-17, 86:5-87:20). Mechanical department inspection records show the only defect in this new boxcar was the door plug that Mr. Hoover flagged. (Exhibit 8). With the railcar in place the night of the incident, Mr. Chambers actually measured the sill step, and at 21 inches to 22.5 inches above the top of the rail on track 12, the sill step of the boxcar was less than 24 inches above the rail and compliant with 49 C.F.R. § 231.27 (c)(3)(iii). (Exh. 7: Incident Report; Chambers Dep. 45:11-49:15, 75:2-787:6; Exh. 3 Photograph of measurement). Circumstantial evidence also directs that the sill step was compliant: Boxcars are manufactured to FRA regulatory standards, Mr. Hoover, whose job it is to inspect for, report, and not to use defective sill steps, did not bad order or report the sill step, and according to Mr. Chambers, Mr. Hoover told him he took no exception to the condition of the boxcar other than the bad-ordered door. (For record citations, see fact recited in "April 2018 Dismount Claim Event").

NS met the FRA guidelines on April 4, 2018. Even Mr. Hoover acknowledges his popping knee is just one of those things that can happen, and there is no negligence if NS complied with the FRA regulations, which it did. (Hoover Dep.162:9-164:15). Accordingly, Mr. Hoover's FELA Dismount Claim is precluded by the SAA and FRSA and must be dismissed as a matter of law.

**Cumulative Claims: Dismounting Cars & Walking on Track Support Ballast**

Indeed, the Court can, and should, also dismiss Mr. Hoover's general, non-specific claims related to mounting and dismounting cars in Plaintiff's Cumulative Claim because there is no evidence at all in this case of a non-compliant, defective sill step. The evidence is that railcars are manufactured to FRA standards (i.e. correct sill step heights), Mr. Hoover -as a carman inspector- is charged with the duty not to use non-compliant sill steps and must flag them for repair, and there is no evidence that any sill step of any railcar used by Plaintiff at the John Sevier Yard was not compliant as Plaintiff never measured (Hoover Dep. 204:22-206:24, 205:5-14; 206:22-24). "Speculation cannot supply the place of proof." *Moore v. Chesapeake & Ohio Ry Co,* 340 U.S. 573, 578 (1951).

The Court can, and should, also dismiss the ballast claims in the Cumulative Claims. Plaintiff does not complain about large ballast-he walked on small gravel. (Hoover Dep. 217:11-16). Plaintiff's only criticism of the yard (small gravel) ballast is that at unspecified times and in unspecified places, that too much or too little gravel was laid out so that it was not always in a perfectly flat, smooth plane; the gravel "may be a little low." (*Id.* 216:25-217:10, 142:23-144:9). He agrees that the geographical terrain contours of the perimeter of the yard, sloping to the tracks, prevent a flat, even plane of rock to support the track. (*Id.* 215:21-216:24; this slope can be seen in the boxcar photograph of Exhibit 3, marked as "Exhibit 10" to Plaintiff's deposition). Mr. Hoover does not identify with any specificity when, where, the extent of, or how any minor depression or "low" areas of gravel affected him.

There is no evidence that this yard gravel adjacent to and supporting the multiple tracks in the yard, (see photographs in Exhibit 3), was not performing its function of supporting track and providing drainage, etc. Plaintiff may argue that the ballast regulation does not preclude yard

(small gravel) ballast claims. This is not so. According to the *Nickels* court, claims regarding ballast used "along," "adjacent to," and "parallel to" the track are precluded because they are a part of the track structure and rail system. *Id*. at 433. That is also the situation here. *See also, Norfolk & Western Ry. Co. v. Public Utilities Comm'n of Ohio*, 926 F.2d 567 (6th Cir. 1991) (holding that an Ohio state law requiring railroads to construct walkways on bridges was preempted; *Missouri Pac. R.R. Co. v. R.R. Comm'n of Texas*, 823 F. Supp. 1360 (W.D. Tex.1990), affirmed, 948 F.2d 179 (5th Cir. 1991)(holding that a Texas regulation requiring trackside walkways was preempted); *Norfolk & Western Ry. Co. v. Burns*, 587 F. Supp. 161 (E.D. Mich. 1984) (overturning the state's fine against the railroad for having "large rocks" in the walk area between the tracks in a rail yard because ballast regulations are preempted); *Norris v. Central Ga. R.R. Co.*, 635 S.E.2d 179 (Ga. App. 2006)(granting railroad's summary judgment because the employee's FELA claim that the railroad was negligent for using mainline ballast instead of yard ballast was precluded by the Track Safety Standards regarding ballast set forth in 49 C.F.R. § 213.103); *Black v. Seaboard Sys. R.R.*, 487 N.E.2d 468 (Ind. App. 1986)(holding that an Indiana state requirement that a railroad construct walkways along tracks for its employees was preempted; *Munns v. CSX Transp.*, No. 3:07CV2507, 2009 WL 805133, at *4 (N.D. Ohio Mar. 27, 2009) ("*Nickels* holds that the FRSA is preemptive as to claims of individual injury from using ballast in areas where railway employees will be walking"); *Kresel v. BNSF Ry. Co.*, No. 09–CV–2861, 2011 WL 1456766, at *8 (D. Minn. April 15, 2011) (controlling factor in the preemption analysis is that the plaintiff was standing adjacent to the track and upon the ballast that was serving the functions of 49 C.F.R. § 213.103).

It is clear, then, that claims of improper ballast size or distribution are precluded if the rock at issue is essentially performing the functions enumerated in the FRA regulation. Here, the ballast at issue performed those functions. Mr. Hoover essentially agrees that the ballast serves these

purposes by admitting that it is an essential part of his job to walk on ballast adjacent to and among the multiple, closely spaced tracks of the John Sevier Yard as seen in the John Sevier Yard photographs above (and in Exhibit 3). (Hoover Dep. 201:25-203:18, 208:5-209:7).

Therefore, as matter of law, the uncontroverted evidence shows that NS's railcars and yard ballast adjacent to the track - about which Mr. Hoover complains - met the federal safety standards. His Complaint is precluded, and NS is entitled to summary judgment.

IV.     **Plaintiff Cannot Prove That His Workplace Was Unsafe.**

Regardless of the statute of limitations barring all claims in the case and regardless of preclusion, Plaintiff has no evidence and can have no evidence that his workplace was unreasonably unsafe. Railroad work is potentially dangerous, as Plaintiff admits. That is why he was, without any dispute, extensively trained to perform the work as safely as possible.

As to ballast, there can be no question at all that the FRA ballast regulation precludes any claim related to ballast type, size, or walking in parts of the yard where the terrain is sloped, such as shown in the photograph of subject boxcar, viewed from the southside of track 12. (Exh. 3: Photographs). As to any other ballast along the flatter areas of the John Sevier Yard, even if not precluded by the FRA regulation, FELA does not demand a perfectly safe workplace or perfectly regular walking surfaces. Mr. Hoover is trained to watch where he walks; he is stepping over uneven terrain of rails and ties of tracks (not to mention climbing up and across railcars). FELA provides for a "reasonably" safe workplace, not a "perfectly" safe one. *Przybylinski v. CSX Transportation, Inc.*, No. 07-1755, 292 Fed.Appx. 485, 2008 U.S. App. LEXIS 19859, 2008 WL 4181191 (6th Cir. Sept. 12, 2008) (granting summary judgment where employee fell on irregular railroad bridge walking surface and holding that surface irregularities are important structural components and *de minimis* irregularities, particularly where not specifically shown to cause

injury, as a matter of law, is not unreasonable because "CSX has a duty to provide a reasonably safe working environment, not a perfect working environment"); *Van Gorder*, 509 F.3d 265, 269 (6th Cir. 2007) (A railroad need not "eliminate all workplace dangers.").

Indeed, Mr. Hoover admits that most of his job tasks – walking, squatting, kneeling, climbing, and mounting and dismounting and crossing over railcars, are essential and common parts of his job and cannot be done any other way. (Hoover Dep. 201:25-203:18, 208:5-209:7; Exh. 5: Carman Job Tasks). Mr. Hoover complains about having to, for a very limited period of time, jack a few cars "in-the-line-of-road" on a pocket yard track as opposed to using the permanent in-place jacks at the RIP Track facility. John Sevier Yard carmen commonly go out on the mainline to repair cars, see *Cottle v. Norfolk Southern Ry Co.*, 2019 U.S. Dist. LEXIS 180328, 2019 WL 5295184 (E.D. Tenn. Oct. 18, 2019), which may require the use of a truck with a boom to lift and place jacks, blocking for jacks, and manually positioning jacks with a partner. Mr. Hoover simply never bid on such a job before 2016. (Hoover Dep. 65:16-66:6, 241:15-242:2). However, this is always partnered work which NS provides training and a standard operating procedure, which Mr. Hoover carried with him and studied. (Hoover Dep. 242:11-24, 245:25-226:9, 247:23-249:5 and Exh. 2: Employee History Inquiry (discussing training); 248:5-19 (discussing CDI 12-28D Jacking Rail Equipment). Mr. Hoover performed the work safely and carefully, (Hoover Dep. 244:6-10), consistent with NS's safety priorities. (See Fact section "Railroad Safety and Training").

Care must be used in "proportion to the danger to be avoided and the consequences that might reasonably be anticipated from the neglect.... It must be commensurate with known dangers." *Aparacio v. Norfolk & Western Ry.*, 84 F.3d 803, 810 (6th Cir. 1996). FELA "does not contemplate absolute elimination of all dangers, but only the elimination of those dangers which

could be removed by reasonable care on the part of the employer." *Padgett v. Southern Ry.*, 396 F.2d 303, 306 (6th Cir. 1978).

What is reasonable under the FELA? It depends upon the task.

> Reasonable care must mean reasonable in light of the normal requirements of the job. A yardman dealing with moving cars cannot expect the same safety as a clerical worker in a ticket office. Here luggage is part of the work. A conductor cannot expect that capable male passengers be limited to packages that can be carried, without needing help, by less capable females; but the alternative would be varying maximums, based upon sex, age, or whatever, in operation worse, even if not regarded as discriminatory.

*Conway v. Consolidated Rail Corp.*, 720 F.2d 221,23 (1st Cir. 1983).

Here Mr. Hoover, himself, admits that walking and walking on gravel ballast, and other tasks, is a necessary part of his job. He was well-trained. As in *Cottell* (an in-the-line-of-road jacking case), as Magistrate Guyton observed, there simply is no negligence. *Supra,* 2019 U.S. Dist. LEXIS 180, *21-*23. Mr. Hoover cannot rely upon a catchall phrase of a duty to provide a reasonably safe workplace for liability unless and until he proves that the work he was doing was truly dangerous or unreasonable in the context of the type of work he must do. He has no such proof and by his own admission cannot have such proof. As the First Circuit has pointed out above, the "danger" of walking on ballast and other tasks should be measured by the job tasks of a typical carman like Mr. Hoover. If part of his job duties entails regularly walking on sloped or un-sloped ballast, and other tasks, then he cannot expect that capable carmen (Plaintiff's surgeon cleared him for this work, see Exh. 5), should avoid these conditions when it is an inherent part of his railroad work. Liability for such an *ad hoc* and unsubstantiated decision would affect all track workers - when there is no scientific proof here that this is an inherently dangerous and harmful task. *See also Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994)(plaintiff cannot recover simply by showing that his injury is in some way related to his

job); *Stevens v. Bangor Aroostook R. Co*., 97 F.3d 594, 598 (15t Cir. 1996)("[t]he employer's duty to maintain a safe workplace does not require all dangers to be eradicated, but it does demand the elimination of those that can reasonably be avoided in light of the normal requirements of the job"); and *Potrykus v. CSX Transp., Inc*., 2010 U.S. Dist. LEXIS 73722 (N.D. Ohio, 2010)(plaintiff must present some evidence that the railroad negligently required him to perform dangerous tasks.)

## CONCLUSION

For the foregoing reasons, Norfolk Southern submits that the material facts are undisputed and there is no genuine issue for trial, thus, as a matter of law, it requests that this Court dismiss this case.

Respectfully submitted,

Baker, O'Kane, Atkins & Thompson, PLLP

/s/ Emily L. Herman-Thompson
John W. Baker, Jr., BPR # 0012321
Emily L. Herman-Thompson, BPR#021518
2607 Kingston Pike, Suite 200
Post Office Box 1708
Knoxville, Tennessee 37901-0305
(865) 637-5600
(865) 637-5608
jbaker@boatlf.com
ethompson@boatlf.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2021, a copy of the foregoing ***Brief in Support of Motion for Summary Judgment***, was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

s/ Emily L. Herman-Thompson